UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERALD DANESHVAR,

                        Petitioner,

v.

UNITED STATES OF AMERICA,

                        Respondent.

            Civil Case Number 19-13749
            Criminal Case Number 15-20362
            Honorable David M. Lawson

_____/

## OPINION AND ORDER DENYING MOTION TO VACATE SENTENCE

Petitioner Gerald Daneshvar was part of a group of doctors practicing under the name Mobile Doctors that provided home health care to patients on Medicare. Mobile Doctors perpetrated a scheme to defraud Medicare by billing for home visits for patients who were not homebound, charging for services that were not rendered, and "upcoding," that is, using billing codes that did not match the services provided in order to extract more from Medicare. Daneshvar was indicted along with two others for participating in this scheme, but he insisted at trial that he knew nothing about Mobile Doctors's illegal practices. The jury did not believe him and convicted him of conspiracy to commit health care fraud. His conviction and sentence were affirmed on appeal.

Daneshvar now moves to vacate his conviction and sentence, alleging that his attorney performed deficiently in a variety of ways. Many of his arguments recast as ineffective-assistance-of-counsel claims the same arguments about alleged trial errors that previously were considered and rejected by the court of appeals. Because none of his claims justifies the relief that he seeks, the Court will deny the motion.

I.

At trial, over which the Honorable Avern Cohn presided, the government set the stage by

explaining how Medicare operates and how Mobile Doctors conducted its billing practices.  The

court of appeals provided a summary of the evidence, which, although lengthy, is set forth here in

full to provide context for Daneshvar's claims:

> Medicare is a taxpayer-funded healthcare benefit program for persons who are 65 and older and for those under 65 with disabilities. Typically, a Medicare beneficiary visits a doctor's office and Medicare reimburses the doctor for the provided service. Medicare also pays for doctors' home visits in certain circumstances; however, house calls cost Medicare more money than treatment in a doctor's office. Thus, to qualify for a home visit, a patient must be homebound, which occurs if the patient has a condition because of an illness or injury that restricts the patient's ability to leave his or her place of residence without the aid of a supportive device (e.g., cane, wheelchair, etc.). Also, the homebound patient actually must need the physician's services.
>
> Given the voluminous number of beneficiaries and doctors, Medicare does not review each home healthcare claim. Instead, Medicare relies upon doctors to accurately and honestly bill the services they provide.
>
> In 2003, Dike Ajiri, a non-medical professional, opened Mobile Doctors, headquartered in Chicago. It eventually expanded into seven states, including Michigan, and offered physician services to homebound Medicare beneficiaries. It hired doctors who agreed to assign their Medicare billing rights to the company. After a home visit, each doctor would fill out a routing slip describing the patient's diagnoses using Medicare codes and certifying that a qualified home visit had occurred. The original of the routing slip stayed with the patient file, while the carbon copy went to Mobile Doctors, which sought payment from Medicare. Upon receipt of payment, Mobile Doctors would then pay the physician-employee a percentage of what the company received from billing Medicare.
>
> The problem with this business model was that a large portion of Mobile Doctors's patients, in fact, did not qualify as being homebound. For instance, one doctor saw a supposedly homebound patient return home carrying groceries. Another patient rescheduled her appointment because she was bowling. Nevertheless, Mobile Doctors's physicians were undeterred in characterizing such patients as homebound. In some instances, the doctors went even further: they signed certifications for additional unneeded treatment from companies that provided at-home nursing or physical therapy services—companies that had referred the patients to Mobile Doctors.
>
> For many patients, whether legitimately homebound or not, Mobile Doctors exaggerated the services they needed. For example, Mobile Doctors scheduled each patient for a home

visit every 30 days, regardless of whether it was necessary. At most, only half of these patients needed the prescribed medical care.

Mobile Doctors also engaged in upcoding, a fraudulent practice in which a healthcare provider submits a Medicare code for a more serious and more expensive diagnosis or procedure than the provider actually diagnosed or performed. Typically, at each home visit, a doctor met with a patient for 15 minutes at a minimum. Then, the doctor filled out the routing slip and, regardless of how healthy the patient was, the doctor usually selected only the two most expensive Medicare reimbursement codes for home healthcare. These top two codes are supposed to be rare because Medicare limits them to complex visits lasting around an hour and requiring extensive examination and treatment. But, Mobile Doctors utilized these codes for almost every doctor's visit, even visits as short as 10 minutes, which involved no tests or other assessments.

In order to justify the higher-reimbursement codes, Mobile Doctors instructed their physicians to list at least three diagnoses in the patient file; if the doctors did not list enough, then a staff member added more to meet the three-diagnoses minimum. Typical diagnoses used to pad the claims were conditions that are common to persons over 50 years old: degenerative joint disease, degenerative disk disease, high blood pressure, chronic pain, arthritis, and vitamin D deficiency.

Mobile Doctors only paid their physicians if they checked at least one of the top two billing codes on their routing slips. If the doctor billed for the higher of the top two codes, the doctor was paid more. And each doctor knew which codes paid the most. Every two weeks, physicians received a pay chart detailing the pay for all doctors at the company. The pay chart detailed the number of patients the physician visited per code, and how much Mobile Doctors paid for that particular code.

Mobile Doctors also encouraged their physicians to order diagnostic tests at specific intervals and required baseline laboratory tests either once or twice per year, whether the patients needed the tests or not. This testing was authorized by a "standing order" that Mobile Doctors required its physicians to sign even though Medicare prohibits testing ordered pursuant to standing orders. But Mobile Doctors thought otherwise: A doctor received bonuses from Mobile Doctors based, in part, on how many tests were authorized under that doctor's name pursuant to the standing order.

*United States v. Daneshvar*, 925 F.3d 766, 771-73 (6th Cir. 2019).

The court then summarized the evidence that the government offered against petitioner

Daneshvar.

In September 2012, Dr. Gerald Daneshvar joined Mobile Doctors as a physician in its Michigan office. He enrolled with Medicare, signed over his Medicare billing privileges to Mobile Doctors, and certified that he would abide by the rules set forth by Medicare and would not submit false claims.

Daneshvar then began conducting home visits. In return, for submitting his routing slips, he received payment from Mobile Doctors along with a pay chart detailing the pay for each physician per patient visit and Medicare code. But, Daneshvar later confessed that approximately 30 percent of his patients that he certified as homebound were, in fact, not so. And, according to one medical assistant, Robin Johnson, the fraud was even worse: Johnson testified that as many as half of Daneshvar's patients were not homebound.

In fact, every time medical assistant Danielle Mangan went with Daneshvar for home visits, there would be at least one patient who was not even at home when they arrived for the visit. Medical assistant Shannon Guyton had similar experiences with Daneshvar. She testified that many of the patients could drive or leave their homes without assistance. One of Daneshvar's patients also testified that she would regularly leave her house for daily activities such as going to the store. Another patient cancelled her appointment because "[s]he was getting ready to leave," and yet another was not home because he was "out with his friend." (Trial Tr. Vol. 3, R. 110, Page ID # 951, 988–89.) Once, when medical assistant India Brimberry was conducting home visits with Daneshvar, she saw a patient pull up in his car with bags, returning from a store. Another patient, Kevin Barrett, biked regularly and played in his church band. Barrett was honest: he told Daneshvar that he was not homebound. But such honesty did not carry over to Daneshvar's Medicare certifications.

In the patient charts, Daneshvar would pre-sign forms documenting the face-to-face encounter, because Medicare rules state that a physician needs to make an in-person visit. Then, the clinical coordinator would fill out the diagnoses based on the routing slip or the exam notes within the chart. The forms stated, "I certify that based on my findings the following services are medically necessary home health services. Check all that apply." (Trial Tr. Vol. 2, R. 109, Page ID # 798.) The form continued, "Further, I certify that my clinical findings support that the patient is homebound (i.e., absences from home require considerable and taxing effort and are for medical reasons or religion services or infrequently or of short duration ... for other reasons ...)." (*Id.* at Page ID # 799.)

Daneshvar not only fraudulently presented patients' homebound status, but he also referred his patients to home healthcare agencies for other unneeded services. Daneshvar once admitted to medical assistant Guyton that one of his patients "didn't need the [medical] service, they weren't homebound." (Trial Tr. Vol. 2, R. 109, Page ID # 930.) But, that isolated instance of candor was not indicative of Daneshvar's practice generally.

As it turned out, Daneshvar would conduct the most home visits of any doctor employed by Mobile Doctors. During his employment, he saw almost 4,000 patients, which worked out to be around 20 patients per day. In order to handle such a large volume, according to several medical assistants, Daneshvar evaluated the patient in approximately 10 to 15 minutes, shorter in duration than evaluations by other physicians employed by Mobile Doctors. And Daneshvar scheduled every patient for his speedy visit every 30 days, regardless of whether the patient needed the house call. At each visit, Daneshvar would typically write three to four diagnoses for the patient on a routing slip; sometimes the clinical coordinator added diagnoses based on the patient chart. Daneshvar even acted as

seemingly clairvoyant: he sometimes filled out the diagnoses before he even met with the patient.

After completion of Daneshvar's home visits, the routing slip was transmitted to the Chicago office, where the Mobile Doctors staff engaged in upcoding. (*See* Trial Tr. Vol. 3, R. 109, Page ID # 804 ("Upcode per Dr. Gerry.").) Daneshvar admitted that "most of his patients were billed at a 4 or 5 level even though they qualified for 3 or lower." (Trial Tr. Vol. 5, R. 112, Page ID # 1363.) Sometimes, Daneshvar himself checked a box with the appropriate Medicare code on the routing slip. Other times, a medical assistant checked the box on Daneshvar's behalf and placed a copy of the routing slip in the patient file. Daneshvar never disapproved of the codes on routing slips, and his signature appeared on all of the routing slips for his home visits. Mobile Doctors would pay Daneshvar whenever he billed at least one of the top two codes. Mobile Doctors also billed Medicare for two or three times the number of hours Daneshvar actually spent with the patient, based upon the routing slip.

At one point, Daneshvar asked Dr. Stephen Mason, another Mobile Doctors employee, how he could make more money. Dr. Mason told him that "[w]e can't bill any higher than we are already billing. We are billing too high already." (Trial Tr. Vol. 4, R. 111, Page ID # 1147.) But there was another way to boost the bottom line—giving injections of medications into the patients' musculoskeletal systems. Dr. Mason was getting paid extra for every injection. His experience led Daneshvar to do the same.

Along with injections, early-and-often testing was a money-maker. Daneshvar signed the Mobile Doctors standing order for testing, which stated:

> Mobile Doctors Physician Standing Orders Preventative Care. Mobile Doctors actively promotes preventative care and early intervention. A thorough history and physical examination should be obtained on all of our patients along with preventative care. Based on the billable diagnosis for (enter state) Medicare, I give my clinical coordinator permission to order testing on my behalf when warranted.

(Trial Tr. Vol. 1, R. 108, Page ID # 712–13; Trial Exs., R. 135, Page ID # 1970.) Pursuant to the standing order, Mobile Doctors's staff would sign Daneshvar's name on testing order forms. The test results would come back, they would go to Daneshvar, and he would initial the results. Daneshvar never objected when Mobile Doctors's staff ordered tests on his behalf pursuant to his standing order.

Ultimately, Daneshvar billed Medicare for almost $ 1.5 million in claims, was paid a salary of almost $250,000 from Mobile Doctors, and received the highest bonuses of all the doctors employed by the company. Mobile Doctors rewarded Daneshvar handsomely because he "does literally anything we ask," and so "we need to keep him happy." (Trial Tr. Vol. 4, R. 111, Page ID # 1225; Trial Tr. Vol. 5, R. 112, Page ID # 1372–76; Trial Exs., R. 135, Page ID # 1976–79.) In June of 2013, Mobile Doctors re-signed Daneshvar's contract, agreeing to reward him with a $15,000 bonus. Mobile Doctors also agreed to pay

Daneshvar an additional $4 per patient, but only when he billed the two highest codes, which were "the actual levels that affect[ed his] pay." (Trial Exs., R. 135, Page ID # 1972.)

Eventually, federal agents caught up with Mobile Doctors. In August 2013, agents executed search warrants at all three Mobile Doctors offices, including the Michigan office where Daneshvar worked. The same day, two agents interviewed Daneshvar at a coffee shop. Daneshvar admitted that: (1) even though he certified his patients as homebound, approximately 30 percent of them were not; (2) he referred patients to home healthcare agencies, including those patients who were not homebound; (3) most of his patient visits lasted 15 to 20 minutes, allowing him to see 20 patients per day; (4) most patients were billed at "4" and "5," the two highest Medicare codes, and thus, most of his patients were misbilled because they should have been billed at a "3" or lower; and (5) his salary from Mobile Doctors was tied to billing codes "4" and "5."

A federal grand jury indicted Daneshvar on one count of conspiracy to commit healthcare fraud, under 18 U.S.C. § 1349, and two counts of healthcare fraud, under 18 U.S.C. § 1347. The case proceeded to a jury trial. On May 8, 2017, the jury convicted Daneshvar of Count 1, but found him not guilty of Counts 2 and 3. Daneshvar filed a motion for a new trial, and the district court denied the motion. On January 18, 2018, the court sentenced Daneshvar to 24 months of imprisonment followed by three years of supervised release and a restitution amount of $ 900,000. Daneshvar timely appealed.

*Id.* at 773-75 (footnote omitted).

In addition to the petitioner, the government charged two other physicians at Mobile Doctors, Dr. Leonard Van Gelder and Dr. Stephen Mason. The petitioner was the only one who went to trial. Van Gelder and Mason each plead guilty to one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. Van Gelder was sentenced to 24 months' probation. Mason received 18 months' probation.

The petitioner, represented by trial counsel, raised ten issues on appeal, which the Sixth Circuit boiled down to the following four areas of alleged error: (1) the district court abused its discretion by excluding certain evidence; (2) the judge improperly gave two Sixth Circuit criminal pattern jury instructions and one preliminary jury instruction; (3) the judge should have given the jury a supplemental instruction after the jury, during its deliberations, posed

a question to the court; and (4) the district court abused its discretion when sentencing the petitioner.  The Sixth Circuit rejected each alleged error.

The petitioner timely filed his motion to vacate his sentence under 28 U.S.C. § 2255 on December 11, 2019.  His 76-page brief raises eight issues — all criticizing his lawyer's performance — which, like the issues raised on direct appeal, can be grouped as follows: trial counsel was ineffective by (1) failing to investigate and introduce evidence at trial, (2) failing to call witnesses as part of his defense, (3) failing to impeach  government witnesses and object to *Brady* and *Kastigar* violations, and (4) failing to raise relevant constitutional claims on appeal. The motion is supported in large part by the defendant's declaration, which was signed in December of 2019, nearly three years after his conviction.  The government filed a response.  The defendant did not file a reply.

Daneshvar also filed a motion for release pending a decision on his 2255 motion based in part on his fear of contracting COVID-19, which the court denied.

II.

A federal prisoner challenging his sentence under section 2255 must show that the sentence "was imposed in violation of the Constitution or laws of the United States," the sentencing court lacked jurisdiction, the sentence exceeds the maximum penalty allowed by law, or it "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).  "A prisoner seeking relief under 28 U.S.C. § 2255 must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)).

A claim that could have been raised on direct appeal generally is not reviewable in a section 2255 motion. *Bousley v. United States*, 523 U.S. 614, 621 (1998). However, a claim that "cannot otherwise be reviewed for the first time on a § 2255 motion can be reviewed as part of a successful claim that counsel provided ineffective assistance." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001). Claims of ineffective assistance of counsel are properly raised in a section 2255 motion. *United States v. Graham*, 484 F.3d 413, 421-22 (6th Cir. 2007) (quoting *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997)).

In a federal habeas proceeding, when the Court weighs a claim of ineffective assistance, "[a]n evidentiary hearing is required unless the record conclusively shows that the petitioner is entitled to no relief" on his claim. *Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018) (quotations omitted). "Where there is a factual dispute, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims," but "[a] petitioner's mere assertion of his innocence, without more, does not entitle him to an evidentiary hearing." *Ibid.*

And where the record presents "considerable doubt" about the interactions of a petitioner and his attorney, the Court should conduct an evidentiary hearing to bring clarity to the proceedings. *See Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003). But where, as here, the existing record demonstrates that the claims of ineffective assistance are unsupported, or that the petitioner has not met the applicable standard, no hearing is required. *Goward v. United States*, 569 F. App'x 408, 412 (6th Cir. 2014). A hearing in this case is not necessary to address Daneshvar's ineffective-assistance-of-counsel claims because the record amply demonstrates their lack of merit.

A.  Applicable Legal Standard

At the outset, the petitioner raises an issue about the legal test that should apply to evaluate his ineffective-assistance-of-counsel claims.  As a general rule, to succeed on such claims, the petitioner "must show both deficient performance and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).  An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  One way of establishing defective performance is to show that defense counsel missed a meritorious argument under the controlling law.  However, the failure to file a meritless motion or raise a groundless objection does not constitute defective performance. *Jalowiec v. Bradshaw*, 657 F.3d 293, 321-22 (6th Cir. 2011) (stating that an "attorney is not required to raise a non-meritorious claim" (citing *Wilson v. Mitchell*, 498 F.3d 491, 514-15 (6th Cir. 2007))); *see also Knowles*, 556 U.S. at 123 (reiterating that the "[Supreme] Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success" to avoid a finding of deficient performance under *Strickland*).

Daneshvar, however, argues that the Court should apply a line of cases that begins with *United States v. Cronic*, 466 U.S. 648 (1984), in which the Supreme Court identified a subset of right-to-counsel violations that support a presumption of prejudice, absolving a petitioner of having to demonstrate it.  In that case, the Court recognized three circumstances in a criminal prosecution that "are so likely to prejudice the accused that the costs of litigating their effect in a particular case is unjustified." *Id.* at 658.  The first situation occurs when the accused "is denied counsel at a critical stage of his trial." *Id.* at 659. Daneshvar does not allege that happened in his case.  Another occurs under circumstances "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into

the actual conduct of the trial." *Cronic*, 466 U.S. at 659-60.  Daneshvar does not suggest that any

such event occurred during his trial.

A third scenario that might justify dispensing with the prejudice requirement occurs when

"counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* at

659.  Daneshvar bases his argument for the application of *Cronic* on this ground.  However, in

order for a presumption of prejudice to arise based on an attorney's failure to test the prosecutor's

case, the attorney's failure "must be complete." *Bell v. Cone*, 535 U.S. 685, 697 (2002).  The trial

record in this case simply does not support this argument.  Trial counsel was engaged at every

stage of the trial.  Daneshvar's criticisms focus on trial counsel's decisions, legal arguments, and

introduction (or not) of certain evidence.  But he does not contend that trial counsel was asleep at

the switch or otherwise "complete[ly]" failed to perform in the adversary process.  The petitioner's

claims, therefore, must be analyzed under the *Strickland* framework, and he must demonstrate both

deficient performance and show prejudice.

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as

to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different.  A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Id.* at 694.

B.  Alleged Failure to Investigate and Offer Exculpatory Evidence

Daneshvar first argues that trial counsel performed deficiently when he did not obtain and

use at trial exculpatory emails between various individuals who were involved in the conspiracy

at Mobile Doctors.  The trial record undercuts this claim.  Trial counsel did attempt to introduce

exculpatory emails at trial.  For example, trial counsel sought to admit an email from December

27, 2012, in which Mobile Doctors branch manager Melissa Merideth wrote to Mobile Doctors president Dike Ariji, "[We] don't want [the doctors] asking too many questions about billing etc. [L]et['s] keep them in the dark, we cover their liability, let us cover ourselves and that's the end of it!"  (ECF No. 118, Page ID.1700). The district court declined to admit the email, finding it irrelevant and hearsay.  The Sixth Circuit found that the relevance ruling was erroneous, but it upheld the exclusion of the evidence on hearsay grounds.  It also noted that trial counsel brought the email to the jury's attention during cross-examination of Dr. Steven Mason, who also was employed by Mobile Doctors.  *See Daneshvar*, 925 F.3d at 778 (stating that "Daneshvar's point — that the company's management was hiding its billing practices from the doctors — could have been, and in fact was, made through the witnesses at trial").  For instance, Mason testified at trial as follows:

> Trial counsel: Okay. But my question is a little more specific, and if you can't answer, just tell me, that's fine.  When you saw [the email between Ariji and Merideth] and you read it, at any point in time since you have seen it and read it, including when you discussed it with [federal agents] on Tuesday, did it make you think, yeah, that is how it was, I was in the dark about billing back then?
> Mason: Yes.

ECF No. 111, PageID.1197.  That testimony shows that, contrary to Daneshvar's argument, trial counsel did attempt to introduce exculpatory emails.  The fact that the trial judge declined to admit them does not render trial counsel's performance substandard.  Moreover, as the Sixth Circuit noted, the jury did hear testimony consistent with the emails, i.e. that Mobile Doctors wanted to keep its billing habits secret from its doctors.  Thus, trial counsel cannot be deemed ineffective, even if his efforts were not successful in persuading the trial judge to receive the emails in evidence.

Daneshvar also argues that trial counsel failed to gather billing reports, training documents, and documents from other trials related to misconduct at Mobile Doctors that would have

established the petitioner's ignorance of the fraud that occurred at Mobile Doctors.  However, although the petitioner attached some exemplars of those documents to his motion, he has not explained how they would have assisted in his defense in any material way.  The documents at best are cumulative and even could have confused the jury.  Moreover, as the court of appeals noted, the petitioner "repeatedly put forth evidence that the company's doctors were not made aware of Mobile Doctors's final billing processes" through the testimony of Dr. Mason, Dr. Leonard Van Gelder (another Mobile Doctors physician), and the petitioner himself.  *Daneshvar*, 925 F.3d 766, 777-78.  Thus, the jury did hear evidence tending to support the petitioner's claim that he was unaware of the billing practices.  The fact that the jury rejected the evidence does not render trial counsel constitutionally ineffective.

Moreover, trial counsel did attempt to introduce summary charts detailing the defendant's billing history.  The district court, however, excluded those documents on relevancy grounds.  The Sixth Circuit affirmed, noting that even if the charts were admissible, the defendant was not harmed because the defendant "elicited the same information for the jury's benefit earlier in the trial."  *Id.* at 781.  Thus, the defendant cannot show that trial counsel's efforts (or failure to make additional efforts) to introduce exculpatory emails or summary billing charts were ineffective under *Strickland*.  By the same token, trial counsel cannot be faulted for failing to introduce various other documents which would have been cumulative in light of the witness testimony.  Overall, the petitioner is not entitled to relief on this ground.

### B. Failure to Call Witnesses

The defendant also argues that trial counsel was ineffective by failing to call several witnesses who he says were "critical" to his defense.  The decision of "whether to call a witness and how to conduct a witness's testimony are classic questions of trial strategy that merit

*Strickland* deference." *Rayborn v. United States*, 489 F. App'x 871, 878 (6th Cir. 2012).  Put another way,

> [t]he decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess.  Thus, counsel's decision as to whether to call specific witnesses — even ones that might offer exculpatory evidence — is ordinarily not viewed as a lapse in professional representation.

*Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005).

Daneshvar says that trial counsel should have called Nicole Whitteredge, a medical biller for Mobile Doctors, Diki Ariji, the CEO of Mobile Doctors, or Melissa Meridith, the Southfield branch manager at Mobile Doctors.  However, Daneshvar offers no concrete information about what that they would have said that could have made a difference in his case; he merely speculates that their testimony would have helped him.  Daneshvar's defense at trial was that he was unaware of Mobile Doctors's illegal billing practices.  As noted above, trial counsel called witnesses and put forth evidence in support of that defense.  The petitioner does not explain adequately how calling these witnesses would have materially added to his defense or changed the verdict.  And although Daneshvar believes their testimony would have been helpful, it is also possible that the witnesses would have hampered his ignorance-based defense.

Daneshvar also attaches a declaration from Latanya Tubbs, who says that the petitioner encountered her through an acquaintance.  She purports to be a Medicare biller who would have acted as an "expert witness" and "explain[ed] to the Jury that Dr. Daneshvar's payroll sheets did not point to any conspiracy."  ECF No. 142-11, PageID.2281.  Tubbs goes on to state that she would have testified but was never contacted.  This after-the-fact declaration does not show that trial counsel was ineffective.  The petitioner has not offered any information to suggest that trial counsel ever knew of Tubbs.  Even if he did, his decision not to call an "expert" witness in medical billing is within the realm of trial strategy.  Moreover, as noted above, trial counsel introduced

evidence supportive of the defendant's ignorance-based defense.  The petitioner has not shown convincingly that calling Tubbs would have materially changed the outcome of the case.

Overall, trial counsel made strategic choices in calling witnesses.  It is presumed that those choices were made based on counsel's assessment of the evidence, and in light of the evidence presented, none of the choices to forego presenting additional evidence were professionally unreasonable.  The petitioner has not established that trial counsel was ineffective on this ground.

### C. Failure to Impeach or Object to *Brady* and *Kastigar* Violations

The petitioner argues that trial counsel failed to impeach a federal agent and two co-conspirator doctors who testified for the government.  Although the petitioner admits that trial counsel questioned the accuracy of the agent's memory of an unrecorded interview with the defendant, the petitioner believes that counsel's cross-examination fell short because it did not fully discredit the agent's testimony.  But the petitioner's wish that trial counsel's questioning would have resulted in more favorable answers for the defendant is not a basis to find trial counsel performed deficiently.  Daneshvar says that the federal agent provided "false testimony" to the jury.  But he offers no support for that statement, and he does not specify what portion of the testimony was false or explain what trial counsel should have done to expose or counteract the falsehood.

Daneshvar also contends that trial counsel failed to impeach Dr. Van Gelder with a prior inconsistent statement, namely, that Van Gelder pleaded guilty to the fraud charges that were lodged against him, despite asserting to Daneshvar before the guilty plea that he was not guilty. The only evidence the petitioner puts forth to support this argument is his post-conviction declaration from December 2019 in which he asserts that Van Gelder told him that he was not guilty.  Even if Van Gelder made such a statement, there is no evidence that trial counsel was

aware of it. And there would have been questionable utility in eliciting a prior denial of guilt made by a convicted co-conspirator.

The petitioner also alleges that the government withheld favorable evidence in violation of *Brady v. Maryland*, 397 U.S. 742 (1970). He argues here that his attorney failed to request and introduce exculpatory evidence from other cases that involved allegedly fraudulent activity at Mobile Doctors. The petitioner did not raise a *Brady* claim on appeal. Putting any procedural default issues aside, the claim lacks merit. The petitioner merely speculates that exculpatory evidence indeed existed in other unrelated cases involving Mobile Doctors. Absent any explanation as to what the evidence was and how it would have been exculpatory, any allegation of defective performance based on an unmade *Brady* demand must fail.

Daneshvar apparently attended a meeting with government agents some time before trial, at which the government presented him with a so-called *Kastigar* letter, as is the custom in this district, which is used to avoid the problems described by the Supreme Court in *Kastigar v. United States,* 406 U.S. 441 (1972). The essence of such letters is that the government agrees not to use a defendant's statements from the meeting as direct evidence at a trial, but those statements can be introduced to impeach contradictory testimony the defendant may offer at trial. Those meetings took place in November and December 2014. Under the terms of the agreement, the parties agreed that if the defendant went to trial, the government could use the defendant's statements from his proffer on cross-examination to rebut evidence that was inconsistent with statements made during proffer. At his December 2014 proffer, the defendant told agents that he was aware of the fraudulent billing and upcoding that occurred at Mobile Doctors and stated that he took responsibility for his wrongdoing in the scheme. At trial, however, Daneshvar denied any

involvement in or awareness of the fraud that occurred at Mobile Doctors.  That in fact, was the

cornerstone of his defense.  For example, the defendant testified on direct as follows:

> Trial counsel:  Okay. Let me ask you a fairly simple question. Did you ever receive
> payments for services you didn't perform?
>
> Defendant: Not once.
>
> Trial counsel:  Did you ever write down or sign a form for people you didn't see?
>
> Defendant:  Not once.

ECF No. 113, PageID.1474.  Because that testimony was inconsistent with the information that

Daneshvar provided in his proffer-protected statements, the government was permitted to

introduce the proffer-protected information on cross-examination.  Trial counsel did not object to

that evidence, but he had no legitimate ground to object to the government's trial use of the

statements for impeachment.  Moreover, on re-direct, trial counsel questioned the petitioner about

his proffer and elicited testimony attempting to clarify what the petitioner meant about admitting

illegal activity took place at Mobile Doctors, i.e., that he only knew of illegal activity after the FBI

raided Mobile Doctors.  The fact that the jury rejected the petitioner's explanation does not make

out a *Kastigar* violation.

E.  Failure to Raise Issues on Appeal

The petitioner also says that trial counsel was ineffective by failing to raise the *Kastigar*

issue on appeal.  As explained above, however, there was no *Kastigar* violation.  Trial counsel

cannot be deemed ineffective for failing to raise a meritless issue.

Daneshvar also says that trial counsel fell short on appeal because he did not cite or rely

upon *United States v. Ganji*, 880 F. 3d 760 (5th Cir. 2018).  In *Ganji*, the Fifth Circuit reversed

the defendants' convictions for health care fraud on direct appeal, concluding that the government

failed to present sufficient evidence that the defendants engaged in fraud.  The Fifth Circuit's

decision was based on the unique facts presented at trial.  To the extent that the petitioner argues

that trial counsel should have raised a sufficiency of the evidence issue on appeal, he must show

that "the issue not presented 'was clearly stronger than issues that counsel did present.'" *Caver v.*

*Straub*, 349 F.3d 340, 348 (6th Cir. 2004) (*quoting Smith v. Robbins*, 528 U.S. 259, 288 (2000)).

Daneshvar has not met that requirement, and, based on the court of appeals's summary of the trial

evidence, he likely cannot make that showing.  Counsel did not perform deficiently on appeal by

not relying on *Ganji*'s discussion of the very different facts in that case.

### F.  Email Communications between Defendant and Counsel

The petitioner attached several email communications between himself and trial counsel,

which requires some comment.  Although at times the communications tend to show that there

was a level of frustration and disagreement with trial counsel's decisions, it appears that the

petitioner was deeply involved in the mechanics of his defense and asked trial counsel to take

several actions, many of which trial counsel explained were not legally viable or could be

potentially damaging in his opinion.  Notably, trial counsel had to remind Daneshvar not to contact

former colleagues at Mobile Doctors, pointing out that such actions could make his situation

worse.  Overall, the emails leave the impression that the petitioner staunchly maintained his

innocence and ignorance of any illegal billing practices.  Trial counsel put on that defense in the

best way he saw fit.  That the petitioner may have wished trial counsel did certain things differently

does not mean that he received constitutionally defective representation.  As the Sixth Circuit

noted, the jury heard ample evidence in support of his defense.  The jury simply rejected it, at least

as to the conspiracy claim.  Trial counsel is not to blame for the jury's verdict.

## G.  Prejudice

Finally, missing from the petitioner's motion is any meaningful discussion of prejudice, other than his belief in his innocence.  But that belief does not amount to prejudice within the context of an ineffective assistance of counsel claim.  Rather, the defendant must show that but for trial counsel's errors, he would have been acquitted of conspiracy.

The petitioner filed a supplemental brief, which adds little new information; it only points out certain testimony from another trial involving a different doctor that worked for Mobile Doctors, and argues in similar fashion as the opening motion does that the testimony that the other doctor was unaware of Mobile Doctors's billing practices would have supported Daneshvar's trial defense that he was unaware of the fraudulent scheme.  The petitioner has not supplied particular facts about the substance of most of the supposedly unobtained evidence that he says should have been presented.  Instead, he merely speculates that the evidence may have been helpful if obtained.  This applies to his repeated references to "hundreds of daily emails" between Mobile Doctors principals that he says trial counsel never obtained, and to most of the "trial materials" from other cases, which are described only in the vaguest fashion.

Moreover, to suggest that this evidence would have made a difference, even if trial counsel was aware of it, ignores several key aspects of the trial evidence, which were called out in the court of appeals opinion.  For instance, it is apparent that even if the petitioner was "unaware" of certain billing practices, it is undisputed that he entered into a contract with Mobile Doctors to perform house calls for supposedly homebound patients, and that he signed over his Medicare billing entitlement to facilitate payments for those visits.  There also is ample evidence — mainly through Daneshvar's admissions to law enforcement agents — that many of his patients were not homebound, but he made house calls on them anyway.  And he admitted that most of his patients

were billed for visits at a duration and complexity of visit under either level "4" or "5" Medicare billing codes, but that most of the visits should have been billed under the much less lucrative level "3" billing code.  Thus, even if the petitioner was "unaware" of other, even more egregious overbilling through various schemes, none of the evidence that he alludes to would have done much to counter his own admissions that he was aware of at least that much, which is more than enough to establish the elements of the conspiracy charge.

Finally, there is ample evidence, which also was discussed by the court of appeals, that readily supports a conclusion that, even if Daneshvar was "unaware" of certain billing practices, that is only because he chose deliberately to remain ignorant of the billing abuses, despite receiving copious documentation of how his work was billed and the fantastic amount of compensation that he received from the company.  Thus, even if some more evidence could have been presented to support the ignorance defense — and certainly some evidence in support of that defense was presented at trial — there is no sufficient showing that he was prejudiced by the failure to present more along the same lines, since the cumulative testimony on that topic still would not have foreclosed a reasonable jury finding that the petitioner was "ignorant" only because he deliberately chose to remain so.

Deficient performance aside, the petitioner's failure to demonstrate prejudice is fatal to his ineffective-assistance-of-counsel claim.

### III.

The petitioner has not overcome the high bar required to demonstrate defective performance or prejudice under *Strickland*.  Contrary to the petitioner's varied arguments as to trial counsel's performance, the record shows that trial counsel was a zealous advocate for his client during the trial and on appeal.  Trial counsel elicited testimony that supported the defense

that Daneshvar was ignorant of the fraud scheme at Mobile Doctors.  The fact that the jury viewed the evidence differently and rejected his defense does not mean that trial counsel was ineffective.  Significantly, the jury acquitted the petitioner of two of the three counts against him, which strongly militates against any finding that trial counsel was ineffective.  Further, trial counsel presented a fulsome appeal raising several issues.  The fact that the Sixth Circuit rejected the claims is also not grounds for finding ineffectiveness on appeal.

And, as noted, the petitioner's prejudice argument is woefully inadequate.

Accordingly, it is **ORDERED** that the petitioner's motion to vacate sentence (ECF No. 142) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   April 26, 2021